USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 7/31/30

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
ROBINSON SALTO, on behalf of himself, individually,
and on behalf of all others similarly situated,

                Plaintiff,                        **DECISION AND ORDER**

     -against-                             17 Civ. 3583 (PED)

ALBERTO'S CONSTRUCTION, LLC AND CARLOS
RIVERA-SALTO, individually,

                Defendants,
------------------------------------------------------------------X

**PAUL E. DAVISON, U.S.M.J.:**

       On May 12, 2017, the plaintiff, Robinson Salto ("Plaintiff"), on behalf of himself and others similarly situated, filed a complaint asserting wage-and-hour claims pursuant to the Fair Labor Standards Act ("FLSA") and the New York Labor Law ("NYLL") against the defendants, Carlos Rivera-Salto ("Defendant") and Alberto's Construction, LLC (collectively "Defendants"). Dkt. 1. On November 6, 2018, the undersigned, pursuant to an order of reference, dated July 25, 2018, Dkt. 25, conducted a settlement conference during which the parties engaged in extensive, court-supervised negotiations. At a follow-up telephone conference, on November 16, 2018, the parties informed the Court that they had agreed on settlement terms. On December 4, 2018, the parties consented to Magistrate Judge jurisdiction for all purposes pursuant to 28 U.S.C. § 636(c). Dkt. 31. On January 28, 2019, Plaintiff, on behalf of all parties, filed a copy of the parties' fully executed settlement agreement, Dkts. 35-1, 45-2, and a proposed stipulation and order of dismissal, Dkt. 35-2, which this Court so ordered on February 1, 2019, Dkt. 36. The Court retained jurisdiction for the sole purpose of enforcing the settlement agreement. Dkt. 36. Presently before this Court is Plaintiff's Motion to Enforce the Parties' Settlement Agreement

and Enter Judgement. Dkt. 43. For the reasons set forth below, Plaintiff's motion is **GRANTED**.

## I. BACKGROUND

The parties' settlement agreement provided that Defendants were to pay Plaintiff, and Plaintiff's counsel, an aggregate amount of $60,000.00 over a twelve-month period. The first payments were to be paid on or before March 1, 2019. The parties agreed that each month the payments would be made by three separate checks, all sent directly to Plaintiff's counsel. Two checks in the amount of $1,633.56 each were to be made payable to Plaintiff to cover the Plaintiff's back wages and liquidated damages, respectively, totaling $39,205.44 over twelve months. The third check in the amount of $1,732.88 was to be made payable to Borrelli & Associates, P.L.L.C., to cover attorneys' fees and costs, totaling $20,794.56 over twelve months.

The agreement also provided the following:

> In the event that Defendants fail to make the settlement payments in a timely manner pursuant to the above schedule set forth in this Agreement, counsel for Plaintiff shall provide notice of the default by email to Defendants . . . . Defendants will then have ten (10) days from the date of receipt of such notice within which to cure the default by delivering to Plaintiff's attorneys at the address listed above via overnight delivery any amounts due and owing to Plaintiff's attorneys. If Defendants timely cure their breach, no other dates in the above schedule shall become altered or in any way affected. If Defendants fail to timely cure their breach, two hundred percent (200%) of the entire unpaid balance of the payments ($60,000.00 less any payments made under this Agreement) will then become due and owing, and Plaintiff may apply to the Court, which will retain jurisdiction over the Action to enforce the terms of this Agreement, to enter judgement for that amount, plus reasonable attorneys' fees and costs associated with seeking judgement for Defendants' breach including costs and fees for any motion for costs and fees.

Dkt. 45-2 at 4.

Plaintiff alleges that, to date, Defendants have failed to make any payments covering Plaintiff's back wages and liquidated damages. As to attorneys' fees, the parties

2

agree that Defendants were initially making timely payments and that Defendants, at some point, fell behind on payments. Plaintiff appears to now contend that, as of the date of their reply to Defendants' opposition to this motion, Defendants were behind one payment for attorneys' fees and costs in the amount of $1,732.88. Dkt. 50 at 6. Defendants assert that they caught up on these payments and deny that they are in default on attorneys' fees and costs owed. Dkts. 48 at 1-2; 49 at 1. As of December 10, 2019, the date of the filing of the instant motion, Defendants had made nine payments totaling $15,595.94 for attorneys' fees and costs, leaving a total of $5,198.65 owed. Dkts. 45 at 6; 48 at 1. As of January 17, 2020, the date on which Plaintiff filed his reply, Plaintiff acknowledged that Defendants had made two additional payments towards attorneys' fees and costs, bringing the total payments made to eleven. Dkt. 50 at 5. Thus, as eleven payments were due as of January 17, 2020,[1] and the parties agree that eleven payments had been made as of that date, Defendants were no longer in default as it relates to attorneys' fees and costs owed pursuant to the settlement agreement.

Following the Court's approval of the settlement agreement, Defendants allege that Plaintiff was arrested after he was involved in a car accident purportedly caused by his driving under the influence. Dkts. 48 at 2, 49 at 2. Defendant avers that he bailed Plaintiff, his uncle, out of jail and that Plaintiff subsequently left the United States and returned to his country of origin, Ecuador, to avoid further legal trouble related to the accident. Dkts. 48 at 2, 49 at 2.

---

[1] As noted above, the first payment from Defendants was due on or before March 1, 2019; therefore, on January 1, 2019, the eleventh payment became due.

Defendants concede that they have not made payments to Plaintiff strictly in the manner agreed upon in the settlement agreement; however, they contend that this is due to the fact that after Plaintiff moved to Ecuador, Plaintiff allegedly began harassing Defendant's family in an attempt to obtain the settlement payments ahead of the agreed upon schedule. Dkts. 48 at 2, 49 at 2. Defendant further alleges that, on one occasion, Plaintiff showed up at Defendant's father's home "with several armed men and threatened him." Dkt. 49 at 2. In an attempt to end the harassment, Defendant alleges that he and his brother, Romulo H. Rivera ("Romulo"), came to an agreement whereby Romulo would pay Plaintiff the $40,000.00 owed in the settlement agreement and, in exchange, Defendant "agreed to transfer a house that [he] purchased in Ecuador a few years earlier to Romulo." Dkt. 48 at 2; 49 at 2. However, as the house in question was originally purchased in Romulo's name, there was no actual transfer of title in this exchange and, thus, Defendant was unable to produce evidence of this transfer. Dkt. 49 at 3. Additionally, Defendant asserts that Romulo has since sold the house. *Id.* Defendant further alleges that Plaintiff initially demanded that he be paid in cash, but Romulo refused and, instead, paid Plaintiff with two $20,000 certified checks from Banco Bolivariano. *Id.* As noted, Defendants concede that these payments were not in strict compliance with the settlement agreement. Dkt. 48 at 2.

Plaintiff, on the other hand, denies that he ever received any money from Defendants or Defendant's relatives. Dkts. 45 at 4, 51 at 1. On or about March 22, 2019, Plaintiff contends that he called his attorney in this matter to inquire as to why he had not received the first payment he was owed that became due on March 1, 2019. Dkt. 51. Plaintiff's counsel then sought an explanation from Defense counsel as to this missing payment. After speaking with Defendant, Defense counsel replied to Plaintiff's counsel via email that after Plaintiff allegedly harassed

4

Defendant's family in Ecuador, "even hir[ing] some gang members to terrorize them," Defendant's family allegedly paid the full amount due to Plaintiff. Dkts. 45 at 3, 48 at 3, 7. Defense counsel avers that he attached copies of the certified checks to this email. Dkt. 48 at 3. Plaintiff's counsel declares that Plaintiff "adamantly denied" the accusations that "Plaintiff had forced Defendants to pay the full $40,000 owed through illegal coercive means, including with the involvement of 'gang members,'" and denied ever receiving any money from Defendant's relatives. Dkt. 45 at 4.

At Plaintiff's counsel's request for proof of payment, Defendants, on May 23, 2019, produced two letters purportedly from Banco Bolivariano that referenced two $20,000.00 checks made out to "Robinson Gilberto Salto" and, according to Defendant, confirmed that the checks were purchased and paid. Dkts. 45 at 4; 49 at 3. Plaintiff included these two letters, written in Spanish, in its filings, Dkt. 45-4; however, the translation of only one of the letters was provided to the Court, *see* Dkt. 55-1 at 5.[2] Plaintiff responded that these letters were fake and that he never received this money. Dkts. 45 at 4, 51. Consequently, Plaintiff requested that a prosecutor's office in Ecuador conduct an investigation after which Plaintiff allegedly obtained two new letters from Banco Bolivariano concluding that the original two letters provided by Defendant, discussed above, were indeed not executed by Banco Bolivariano. *Id.*; *see* Dkt. 55-1. Only one such letter appears in the record, presumably addressing one of the original letters and

---

[2] On April 24, 2020, the Court ordered the parties, to the extent that they wished the Court to review or rely on their respective Spanish-language filings, to file certified translations into English of their filings by June 15, 2020. Dkts. 52, 53. The parties filed certified translations on June 11, and 15, 2020. Dkts. 54, 55. However, as noted, the translation for only one of original letters from Banco Bolivariano was filed; therefore, the Court does not rely on the untranslated letter in deciding this motion. *See Sicom S.P.A. v. TRS Inc.*, 168 F. Supp. 3d 698, 709 & n.9 (S.D.N.Y. 2016).

5

one of the certified checks. Dkt. 55-1 at 8; *see generally* Dkt. 55-1. In this letter, Banco Bolivariano concluded that "Mr. Salto Zhindo Robinson Gilberto has not been a client of our institution," and "that the document attached to your official letter has not been issued by Banco Bolivariano." *Id.* After Defendants disputed this finding, Plaintiff again requested corroborating evidence from Defendants in support of its claim, "such as proof of any reimbursement payments made by Defendant . . . to his relatives, or any bank account information that shows the deduction of the $20,000.00 checks." Dkt. 45 at 4-5. Plaintiff alleges that Defendants did not provide any additional evidence in support of their claim. Defendants have, however, produced copies of the cancelled checks to the Court, Dkt. 49 at 6-9, and, as noted above, claim that they also produced copies to Plaintiff when requested, Dkt. 48 at 3 (citing the Email to Plaintiff's counsel, Dkt. 48 at 7). Additionally, Defendant attached to his affidavit a "sworn statement . . . from Romulo, confirming that the settlement payments were made." Dkt. 49 at 4. In this notarized statement from Romulo, dated January 8, 2020, Romulo claims that on March 2 and 5, 2019, two checks totaling $40,000 were provided to Plaintiff in order the satisfy the amount owed to Plaintiff. Dkt. 54 at 3.[3]

On December 10, 2019, Plaintiff filed the instant motion to enforce the settlement. Dkt. 43. In the instant motion, Plaintiff argues that as Defendants have allegedly failed to pay any amount of the $39,205.42 that Defendants agreed to pay towards Plaintiff's back wages and liquidated damages in the settlement agreement, Dkts. 45 at 6, 50 at 5, and, as of the date of Plaintiff's reply, allegedly failed to pay $1,732.88 in the attorneys' fees and costs agreed upon,

---

[3] Romulo's notarized statement was not a "sworn" statement as averred by Defendants and, unlike Plaintiff's declaration, failed to comply with 28 U.S.C. § 1746 (requirements for unsworn declarations executed outside of the United States).

6

Defendants now owe Plaintiff 200% of these sums, a total of $81,876.20, Dkt. 50 at 5, pursuant to the liquidated damages provision in the settlement agreement discussed *supra*.[4] Additionally, Plaintiff seeks $2,322.50 in attorneys' fees and costs associated with the instant motion practice. *Id.*

## II. MOTION TO ENFORCE SETTLEMENT

"A district court has the power to enforce summarily, on motion, a settlement agreement reached in a case that was pending before it." *Milner v. City of New York*, No. 10 Civ. 9384, 2012 WL 3138110, at *3 (S.D.N.Y. Aug 2, 2012) (quoting *Meetings & Expositions, Inc. v. Tandy Corp.*, 490 F.2d 714, 717 (2d Cir. 1974)). "A party seeking to enforce a purported settlement agreement has the burden of proof to demonstrate that the parties actually entered into such an agreement." *Benicorp Ins. Co. v. Nat'l Med. Health Card Sys., Inc.*, 447 F. Supp.2d 329, 335 (S.D.N.Y Aug 28, 2006). "It is well established that settlement agreements are contracts and must therefore be construed according to general principles of contract law." *Tromp v. City of New York*, 465 F. App'x 50, 51 (2d Cir. 2012); *see also Powell v Omnicom*, 497 F.3d 124, 128 (2d Cir. 2007) ("A settlement agreement is a contract that is interpreted according to general principles of contract law."). "[O]nce reached, a settlement agreement constitutes a contract that is binding and conclusive and the parties are bound to the terms of the contract even if a party

---

[4] The fact that Defendants fell behind on the payments towards attorneys' fees and costs, and later caught up on these payments is at most an immaterial breach and may entitle Plaintiff to nominal damages only. *See Planete Bleue Television, Inc. v. A&E Television Networks, LLC*, No. 16 Civ. 9317 (PGG), 2018 WL 10579873, at *13-14 (S.D.N.Y. Sept. 19, 2018) (finding that under New York law brief delays in payments, that do not prejudice the plaintiff, are immaterial breaches); *Orlander v. Staples, Inc.*, 802 F.3d 289, 298 (2d Cir. 2015) ("the nonbreaching party is entitled to damages caused even by the immaterial breach, albeit that these may be nominal in amount . . . . [A] nonperforming party is liable for any breach of contract, but the other party is discharged from further performance, and is entitled to substantial damages only when there is a material breach."). Accordingly, I do not include the $1,732.88 of attorneys' fees and costs that Plaintiff alleges were not paid in the calculation of liquidated damages, discussed *infra*.

7

has a change of heart between the time of the agreement to the terms of the settlement and the time it is reduced to writing." *Elliott v. City of New York*, No. 11 Civ. 7291, 2010 WL 3854892 at *2 (S.D.N.Y Sept. 5, 2012) (quotation marks and citation omitted).

The Second Circuit has declined to decide whether New York or federal common law determines whether the parties have reached a settlement of claims involving both federal and state causes of action, "because there is no material difference between the applicable state law or federal common law." *Kaczmarcysk v. Dutton*, 414 F. App'x 354, 355 (2d Cir. 2011). Inasmuch as there is no material difference, I will analyze the issue pursuant to New York's well-settled principles of contract formation. Under New York law, formation of a valid contract requires:

> an offer, acceptance, consideration, mutual assent and intent to be bound. Mutual assent in turn requires "a meeting of the minds of the parties" on all essential terms. Whether such an accord exists is a question of fact that must be resolved by analyzing the totality of the circumstances.

*Sunbelt Rentals, Inc. v. Charter Oak Fire Ins. Co.*, 839 F. Supp2d 680, 687 (S.D.N.Y 2012) (internal quotation marks and citations omitted).

Here, the parties executed the settlement agreement and, by joint letter dated January 28, 2019 (drafted by Plaintiff) submitted it to the Court for approval pursuant to *Cheeks v. Freeport Pancake House, Inc.*, 796 F.3d 199 (2d Cir. 2015). Dkt. 36. Thus, the parties unequivocally expressed their mutual assent and intent to be bound to the "fair and reasonable" terms of the agreement, subject only to the Court's approval as mandated by *Cheeks*. I approved the terms of the agreement on February 1, 2019. Dkt. 36. Moreover, the parties do not now dispute that a valid contract was formed.

### a. Contract Modification

8

Accepting *arguendo* Defendant's contention that he arranged with his brother for Plaintiff to be paid the entire amount of the agreed-upon settlement up front, Defendant is essentially arguing that he unilaterally modified the terms of the contract. The original terms were drafted, and agreed to by both parties, in such a way as to avoid the very uncertainty we face here. Specifically, the two monthly checks for Plaintiff's back wages and liquidated damages were to be sent directly to Plaintiff's counsel, the former to be reported on a W-2 and the latter to be reported on a Form 1099 issued by Defendants. *See* Dkts. 35-1 at 2-3, 45-2 at 3-4. Defendant now alleges that, unbeknownst to his counsel, unsupported by any agreement in writing or even any alleged oral agreement with Plaintiff, and without regard to tax reporting or notice to Plaintiff's counsel, his brother sent $40,000 directly to Plaintiff in satisfaction of the settlement agreement.

Under New York law, "parties may modify a contract 'by another agreement, by course of performance, or by conduct amounting to waiver or estoppel.'" *Kaplan v. Old Mut. PLC*, 526 F. App'x 70, 72 (2d Cir. 2013) (quoting *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 783 (2d Cir.2003)). Although the settlement agreement here does not have language mandating that modification of the agreement must be made in writing, Dkt. 35-1 at 5, "[c]ontract modification requires proof of each element requisite to the formation of a contract, including 'a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms.'" *Id.* (quoting *Express Indus. & Terminal Corp. v. N.Y. State Dep't of Transp.*, 93 N.Y.2d 584, 693 (1999)).

There is no indication in the record that the parties agreed, either orally or in writing, to modify the settlement agreement. Defendant Rivera-Salto does not suggest that he ever spoke to Plaintiff concerning his decision to "arrange[ ] with Romulo that he would pay the full settlement

9

amount to Plaintiff on my behalf," "rather than pursuant to the schedule set forth in the settlement agreement," Dkt. 49 at 1, 2, or that there was a meeting of the minds of the parties on all essential terms of the modification. Indeed, Defendant appears to have never spoken to his lawyer about this decision either. *See* Dkt. 48 at 7. Moreover, there is nothing in the record demonstrating that Plaintiff's course of performance signified assent to the modification. Even if Defendant could demonstrate that Plaintiff accepted the $40,000 payment from Defendant's brother, "a single act of accepting payment is not a course of performance sufficient to demonstrate mutual assent." *Dallas Aerospace*, 352 F.3d at 783 (citing UCC § 2–208(1); 1 James J. White & Robert S. Summers, Uniform Commercial Code, § 1–6(c), at 48 & n. 39 (4th ed.1995); and *CT Chemicals (U.S.A.), Inc. v. Vinmar Impex, Inc.*, 81 N.Y.2d 174, 179 (1993) (requiring "repeated occasions for performance and opportunity for objection")).[5] To the contrary, Plaintiff's course of conduct supports the conclusion that he did not assent to any modification. On or about March 22, 2019, approximately three weeks after Plaintiff was to receive his first scheduled payments pursuant to the Settlement Agreement, Plaintiff declared, "I called my attorney about the check that I was owed. My attorney told me that Defendants' counsel said Defendants gave my settlement money to me directly. I told my counsel that was not true, and that I never received any money from Defendants." Dkt. 51 at 1. After Plaintiff's counsel inquired as to the missing payment, defense counsel, unaware of the actions of Defendant and his brother, replied that "[he] had an interesting discussion with [Defendant] today," in which he learned that Defendant's family had paid Plaintiff $40,000. Dkt. 48 at 7.

---

[5] In his unsworn letter to defense counsel, Dkt. 54 at 3, Romulo claims to have paid Plaintiff with two $20,000 checks dated March 2 and 5, 2019; however, there is no indication of how or when the checks were delivered to Plaintiff or that these alleged payments amounted to repeated performance allowing Plaintiff the opportunity for objection.

"Moreover, for a course of performance to demonstrate mutual assent to a modification, it must be 'unequivocally referable' to the modification." *Dallas Aerospace*, 352 F.3d at 783 (quoting *Rose v. Spa Realty Assocs.*, 42 N.Y.2d 338, 397 N.Y.S.2d 922, 366 N.E.2d 1279, 1283 (1977)). "Similarly, for conduct to amount to a waiver or estoppel, it must not otherwise be compatible with the agreement as written; rather, the conduct of the parties must evidence an indisputable mutual departure from the written agreement." *Ballard v. Parkstone Energy, LLC*, 522 F. Supp. 2d 695, 709–10 (S.D.N.Y. 2007) (quoting *Dallas Aerospace*, 352 F.3d at 783).

Defendant specifically alleges that "[he] *understand[s]* that Plaintiff came to my father's house with several armed men and threatened him," "*apparently* trying to get paid ahead of the settlement schedule." Dkt. 49 at 2 (emphasis added). Defendant further avers that "[he] *understand[s]* that Romulo subsequently purchased two certified checks from Banco Bolivariano . . . and this is how he paid the settlement amount to Plaintiff," "[he] *understand[s]* that Plaintiff originally accepted the payment from Romulo and indicated that he was satisfied," and "[he] *understand[s]* that [Plaintiff] subsequently approached Romulo about a scheme to try and defraud [him] out of additional money; however, [Romulo] informed [him] that he declined to participate." *Id.* at 3 (emphasis added). These declarations, all based on hearsay, do not sufficiently connect Plaintiff's purported actions in Ecuador to the instant dispute and, accordingly, Plaintiff's alleged acceptance of the checks from Defendant's brother, even if established, is not "unequivocally referable" to the alleged modification and does not evidence "an indisputable mutual departure from the written agreement." If Defendant's brother was subjected to extortion in Ecuador, he may have recourse in that jurisdiction, but the instant, and not clearly connected, settlement enforcement proceeding in an American court is not the proper venue.

Additionally, "[f]or a contract to be modified by a course of conduct, 'any change in an existing contract must have a new consideration to support it,'" *id.* at 710 (quoting *Estate of Anglin v. Estate of Kelley*, 270 A.D.2d 853, 705 N.Y.S.2d 769, 772 (N.Y.App.Div.2000)), and, as in *Ballard*, "[t]here are no documents or authorities to support this contention," *id.*, here. Moreover, "[t]he intent to waive must be unmistakably manifested, and is not to be inferred from a doubtful or equivocal act," *id.* (quoting *Ess & Vee Acoustical & Lathing Contractors, Inc. v. Prato Verde, Inc.*, 268 A.D.2d 332, 702 N.Y.S.2d 38, 39 (N.Y.App.Div.2000)), and Defendant does not contend that Plaintiff waived the original terms of the settlement agreement either orally or in writing and has not established that the terms were waived through a course of conduct.

Accordingly, Defendant has not established that the settlement agreement was modified either by another agreement, by a course of performance, or by conduct amounting to waiver or estoppel. I next turn to the question of whether Defendants breached the settlement agreement.

### b. Breach of Contract

"Under New York law, there are four elements to a breach of contract claim: '(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages.'" *Planete Bleue Television, Inc. v. A&E Television Networks, LLC*, No. 16 Civ. 9317 (PGG), 2018 WL 10579873, at *7 (S.D.N.Y. Sept. 19, 2018) (quoting *Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 188-89 (S.D.N.Y. 2011)).

The first two elements are not in dispute. Although the parties also do not dispute whether Defendants failed to strictly comply with the terms of the contract, *see* Dkt. 48 at 2 ¶ 7, they do ultimately dispute whether Defendant's brother actually paid Plaintiff and, thus, whether Defendants breached the settlement agreement and whether Plaintiff suffered any damages.

Having concluded that, regardless of whether Defendant's brother paid Plaintiff, Defendant did not establish that the contract was modified and, similarly, did not establish that the alleged payment was related to the instant contract dispute, I find that Defendants breached the agreement by failing to make any of the scheduled settlement payments to Plaintiff and that Plaintiff was damaged in the amount of $39,205.42.

### c. Liquidated Damages

Plaintiff now seeks 200% of the $39,205.42 in damages pursuant to the liquidated damages provision in the settlement agreement. Dkts. 35-1 at 3, 45-2 at 4. Defendants do not contest the fairness of this provision. In any event, under New York law, "[a] contractual provision fixing damages in the event of breach will be sustained if the amount liquidated bears a reasonable proportion to the probable loss and the amount of actual loss is incapable or difficult of precise estimation." *HLT Existing Franchise Holding LLC v. Worcester Hosp. Grp., LLC*, 609 F. App'x 669, 672 (2d Cir. 2015) (quoting *Truck Rent–A–Ctr., Inc. v. Puritan Farms 2nd, Inc.*, 41 N.Y.2d 420, 425 (1977)). "The burden rests with the party seeking to avoid the payment of damages." *Id.* (citing *JMD Holding Corp. v. Cong. Fin. Corp.*, 4 N.Y.3d 373, 380 (2005)). "The question of whether the fee is enforceable 'is a question of law, giving due consideration to the nature of the contract and the circumstances.'" *Id.* (quoting *JMD Holding Corp.*, 4 N.Y.3d at 379). "Additionally, the New York Court of Appeals has 'cautioned generally against interfering with parties' agreements,' and has noted that 'the trend favors freedom of contract through the enforcement of stipulated damage provisions as long as they do not clearly disregard the principle of compensation.'" *Id.* at 672-73 (internal citations omitted).

Given the fact that Defendants do not contest the fairness of the subject provision and Plaintiff's assertions that he was initially seeking $42,997.50 in compensatory damages,

$42,997.50 in liquidated damages, and $5,000 in NYLL statutory damages, totaling $90,995.00, I find that the liquidated damages provision in the settlement agreement "d[id] not clearly disregard the principle of compensation." *Id.* Accordingly, Plaintiff is awarded $78,410.84, 200% of the outstanding balance owed for back wages and liquidated damages set forth in the settlement agreement.

### d. Attorneys' Fees and Costs

Finally, Plaintiff's counsel requests $2,322.50 in attorneys' fees incurred to enforce the settlement agreement. Dkt. 50 at 5. Alexander Coleman, the "litigating partner" at Plaintiff's counsel's firm, Borrelli & Associates, P.L.L.C., seeks $350 per hour for two hours of work, and Jeffrey Maguire, the firm's senior counsel on this matter, seeks $295 per hour for 5.5 hours of work. Dkts. 44 at 9; 45 at 6; 50 at 4-5. Defendants do not contest the fees sought by Plaintiff's counsel. I find that, based on the backgrounds of the respective counsel, *see* Dkt. 45 at 7-8, the hourly rates requested are reasonable. *See, e.g., Gonzalez v. Scalinatella, Inc.*, 112 F. Supp. 3d 5, 28 (S.D.N.Y. 2015) (collecting cases and, in a case achieving a $7,500 settlement, applying hourly rates of $450 per hour for a partner who began litigating wage and hour claims in 2009 and $350 per hour for a senior associate with 10 years of experience practicing law); *see also Vivaldo v. United Talmudical Academy of Kiryas Joel, Inc.*, 14 Civ. 2636 (GWG), Dkt. 128 at 3 (S.D.N.Y. Feb. 9, 2018) (finding the rates of $350 per hour for Alexander Coleman and $295 per hour for Jeffrey Maguire to be reasonable; the rates these attorneys requested in *Vivaldo* are found at Dkt. 125 at 14-15 of that case). Accordingly, Plaintiff's counsel is awarded $2,322.50 in attorneys' fees.

### III. CONCLUSION

Accordingly, Plaintiff's motion to enforce the settlement agreement is **GRANTED**. Plaintiff is awarded damages in the amount of $78,410.84 for back wages and liquidated damages, and Plaintiff's counsel is awarded attorneys' fees and costs in the amount of $2,322.50, for a total of $80,733.34.

The Clerk of the Court is respectfully directed to enter judgment accordingly and to terminate the instant motion (Dkt. 43).

Dated: July 31, 2020
       White Plains, New York

**SO ORDERED**

PAUL E. DAVISON, U.S.M.J.